UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CLAYTON ADAMS, | Case No. 1:17-cv-00246-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| TEREMA CARLIN, | |
| Respondent. | |

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Idaho state prisoner Clayton Adams ("Petitioner" or "Adams"), challenging Petitioner's Canyon County convictions of second-degree murder and aggravated battery. (Dkt. 1.) The Petition is now fully briefed and ripe for adjudication. The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by Respondent. (Dkts. 8 & 12.) *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006).

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Dkt. 7.) Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying habeas corpus relief.

**MEMORANDUM DECISION AND ORDER - 1**

## BACKGROUND

Absent clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1),

the following facts of Petitioner's case, as described by the Idaho Court of Appeals, are

presumed correct:

>Three friends, Tyler Gorley, Stephen Maylin and Mikeal Campbell, were leaving a Caldwell bar at closing time when they ran into Adams and his friend, Sergio Madrigal, outside the entrance. Campbell spoke to Adams, whom he knew, and the group decided to go to a private party at another location, with the intent to buy beer and drop off Maylin at his home along the way. The five men got into Adams' car. According to the State's evidence at Adams' subsequent trial, the following events then unfolded. En route, Adams asked for beer and gas money from Gorley, Maylin and Campbell, and when he was told that they had no money, Adams became enraged. Adams told the men that he had a knife and a gun and that someone was going to get hurt if he was not given money. In an apparent attempt to scare the men into compliance, Adams started driving recklessly, speeding and running stop lights and stop signs. Gorley, Maylin and Campbell demanded to be let out of the car, but Adams initially refused to stop. Eventually, Adams slammed on his brakes in the middle of a rural road, and the three men got out of the car to escape from him. Campbell was successful in doing so but the other two men were not. As Maylin was exiting by the left-rear passenger door, he was met by Adams, who stabbed Maylin once in the side before Maylin got away. Adams then stabbed Gorley five times, killing him. Adams then got back in his car and drove away, with Madrigal still a passenger. The two men then bought beer, unsuccessfully looked for the party and then drove to Adams' home where he was arrested.

>Adams was charged with first degree premeditated murder, or in the alternative, first degree felony murder, three counts of attempted robbery, and one count of aggravated battery.

*State v. Adams*, 216 P.3d 146, 148–49 (Idaho Ct. App. 2009) (*Adams I*) (*see also* State's Lodging B-4 at 1–2).

The jury found Petitioner guilty of second-degree murder and aggravated battery but acquitted him of first-degree murder and attempted robbery. Petitioner received a unified sentence of life imprisonment with 25 years fixed for second-degree murder, as well as a consecutive 10-year term, with three years fixed, for aggravated battery.

The Idaho Court of Appeals affirmed Petitioner's convictions and sentences, and the Idaho Supreme Court denied review. (State's Lodging B-4; B-7.)

Petitioner pursued post-conviction relief. The state district court ordered resentencing on the second-degree murder conviction, but summarily dismissed Petitioner's other claims. (State's Lodging E-1 at 1669–71; E-5 at 1859–60.) Upon resentencing, the trial court again sentenced Petitioner to life imprisonment with 25 years fixed on the second-degree murder conviction; that sentence was affirmed on appeal.[1] (State's Lodging C-1 at 129–30; D-4.)

Petitioner appealed the dismissal of six of his post-conviction claims. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. (State's Lodging F-4; F-12; F-10.)

In his federal Petition, Petitioner asserts seven claims: (1) ineffective assistance of trial counsel for failing to call Lynette Skeen as a witness; (2) ineffective assistance of

---

[1] The trial court's denial of Petitioner's Rule 35 motion for credit for time served, which argued that his sentences should run concurrently rather than consecutively, was also affirmed. (State's Lodging H-1; H-4.)

trial counsel for failing to object to a paramedic's testimony that Gorley and Maylin suffered stab wounds; (3) ineffective assistance of trial counsel for failing to seek independent DNA testing of Gorley's clothing; (4) ineffective assistance of trial counsel for allegedly abandoning Petitioner's self-defense theory and conceding that Petitioner was guilty of manslaughter; (5) denial of the right to an impartial based on the trial court's failure to excuse a juror for cause sua sponte; (6) prosecutorial misconduct based on the prosecutor's statements in rebuttal closing argument; and (7) cumulative error. (Dkt. 1 at 9-20.)

## HABEAS CORPUS STANDARD OF LAW

Federal habeas corpus relief may be granted when a federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief may be granted only where the state court's adjudication of the petitioner's claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons— both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (internal quotation marks and citations omitted).

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If there is any possibility that fair-minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* To be entitled to habeas relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180

(2011). Therefore, evidence that was not presented to the state court cannot be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determinations of the state court were reasonable. *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2)."); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that the adjudication of a claim on the merits ... was based on an unreasonable determination of the facts, we evaluate the claim de novo, and we may consider evidence properly presented for the first time in federal court.").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). State court factual findings are presumed to be correct and are binding on the federal court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to, or an unreasonable application of, Supreme Court precedent or by establishing that the state court's factual findings were unreasonable—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles*, 752 F.3d at 778.

When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167-68. Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d at 1000.

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief may be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."

*O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

However, some types of claims "are analyzed under their own harmless error standards,

which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070

(9th Cir. 2008). Ineffective assistance of counsel claims are included in this category.

*Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition

governed by AEDPA alleges ineffective assistance of counsel under *Strickland v.

Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), we apply

*Strickland*'s prejudice standard and do not engage in a separate analysis applying the

*Brecht* standard.").

## DISCUSSION

Respondent argues that Petitioner's claims do not survive review under 28 U.S.C.

§ 2254(d). For the following reasons, the Court agrees.

**1.     The Idaho Court of Appeals Reasonably Rejected Petitioner's Ineffective
        Assistance Claims (Claims 1 through 4)**

The state's theory of the case was that Petitioner became angry at his three

passengers and tried to rob them, stabbed Maylin with a knife, and then fatally stabbed

Gorley. Petitioner told a different story—that the passengers attacked him and that he

stabbed Gorley in self-defense. Claims 1 through 4 essentially assert that trial counsel's

actions undermined, or even abandoned, Petitioner's claim of self-defense.

### A.     *Clearly-Established Law*

The Sixth Amendment to the United States Constitution provides that a criminal

defendant has a right to the effective assistance of counsel in his defense. The standard

for ineffective assistance of counsel ("IAC") claims was set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting IAC must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A petitioner must establish both deficient performance and prejudice. *Id.* at 697. On habeas review, a court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one prong is not satisfied and would compel denial of the IAC claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best

criminal defense attorneys would not defend a particular
client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, "are virtually

unchallengeable" if "made after thorough investigation of law and facts relevant to

plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to

investigate a potential defense theory is not ineffective so long as the decision to forego

investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete
> investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690-91. That is, "the duty to investigate does not force defense lawyers to scour the

globe on the off chance something will turn up; reasonably diligent counsel may draw a

line when they have good reason to think further investigation would be a waste."

*Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Further, counsel is not deficient in an area

where an investigation would not have been fruitful for the defense.

The Ninth Circuit has provided some insight into the *Strickland* standard when

evaluating an attorney's "strategy calls." These cases are instructive in the Court's

assessment of whether the state court reasonably applied *Strickland*. *See Duhaime*, 200

F.3d at 600.

**MEMORANDUM DECISION AND ORDER - 11**

First, tactical decisions do not constitute IAC simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to strategy does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Third, *Strickland* gives a trial attorney wide discretion with respect to abandoning inconsistent defenses. *See Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (holding that counsel's failure to develop a mens rea defense was reasonable because such a defense "would have conflicted with the primary defense theory of misidentification"); *Turk v. White*, 116 F.3d, 1264, 1267 (9th Cir. 1997) (counsel's selection of self-defense theory was reasonable and obviated his need to investigate defendant's claim of incompetency). Fourth, "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017); *see also id.* ("Weeden's counsel could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal.").

If a petitioner shows that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694. As the

*Strickland* Court instructed:

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury. Some of the factual
> findings will have been unaffected by the errors, and factual
> findings that were affected will have been affected in
> different ways. Some errors will have had a pervasive effect
> on the inferences to be drawn from the evidence, altering the
> entire evidentiary picture, and some will have had an isolated,
> trivial effect. Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have been affected
> by errors than one with overwhelming record support. Taking
> the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result

must be substantial, not just conceivable." *Richter*, 562 U.S. 86 at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de

novo standard of review. Another layer of deference—to the state court decision—is

afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims

on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an

> incorrect application of federal law." *Williams*, *supra*, at 410,
> 120 S. Ct. 1495. A state court must be granted a deference
> and latitude that are not in operation when the case involves
> review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. That is, when evaluating an IAC claim under § 2254(d), this

Court's review of that claim must be "doubly deferential." *Pinholster*, 563 U.S. at 190

(internal quotation marks omitted).

### B.     *Petitioner Is Not Entitled to Relief on Claims 1, 2, 3, or 4*

The Idaho Court of Appeals considered and rejected Petitioner's ineffective

assistance claims, presented here as Claims 1 through 4, on appeal from the partial

dismissal of Petitioner's post-conviction petition.

### i.     Claim 1

In Claim 1, Petitioner asserts that his trial counsel was ineffective in failing to

investigate and call a witness in his defense.

After the altercation that resulted in Gorley's death, Lynette Skeen—who lived

nearby—reported that she heard a male voice outside her home yell, "Get the Fuck back

here." (State's Lodging E-1 at 393.) She also saw the headlights of Petitioner's car.

Though the state listed Lynette Skeen as a witness, it did not call her at trial. *Adams v.

State*, 387 P.3d 153, 167 (Idaho Ct. App. 2016) (*Adams II*). Petitioner's counsel also did

not call Skeen to testify as a witness.

Petitioner asserts that trial counsel should have investigated Skeen, and called her

as a witness, because Skeen's statement—that she heard a male yelling "Get the Fuck

back here"—corroborated Petitioner's self-defense theory.[2] (Dkt. 21 at 13.)

The Idaho Court of Appeals rejected this claim. In doing so, it addressed both

*Strickland* prongs:

> Adams only offered conclusory allegations as to what [Skeen] would have testified to at trial based on a police report. Such argument is mere speculation and inadmissible. Thus, Adams failed to provide admissible evidence concerning the substance of [Skeen's] testimony. Moreover, Adams failed to show that [Skeen] would have been available to testify and that [she] would have testified consistently with her respective alleged statements and consistently with Adams's version of the events. Adams has not provided evidence sufficient to overcome the presumption that trial counsel made a strategic decision not to call either witness.

*Adams II*, 387 P.3d at 167–68. That is, the state court held that trial counsel reasonably

decided not to call Skeen and that Petitioner could not show prejudice in any event, since

he had not shown that Skeen would have testified consistently with Petitioner's story

about the altercation.[3]

---

[2] The Court has already rejected Petitioner's argument that Claim 1 is fundamentally altered such that *Martinez v. Ryan*, 566 U.S. 1 (2012), might apply and permit de novo review. (Dkt. 21 at 8-13; Dkt. 32 at 5-6.) Thus, the Court reviews the state court's decision on Claim 1 under § 2254(d).

[3] Contrary to Petitioner's assertion (*see* Dkt. 21 at 14-15), the Idaho Court of Appeals did, in fact, consider the prejudice prong of Claim 1. The court stated that "Adams failed to show that [Skeen] would have been available to testify and that [she] would have testified consistently with her respective alleged statements and consistently with Adams's version of the events." *Adams II*, 387 P.3d at 167–68. The court did not use the term "prejudice," but this is plainly a holding that Petitioner had not established a reasonable probability of a different outcome under *Strickland*.

The Idaho Court of Appeals' rejection of Claim 1 was not unreasonable under AEDPA. There was no evidence that Skeen could identify the voice she heard. As this Court previously explained when it denied Petitioner's motion for discovery with respect to this claim, "even if the jury had heard Skeen's report of the incident, it is highly unlikely that the jurors would have assumed that the victim—rather than Petitioner—made the statement, 'Get the fuck back here,'" especially given that "multiple witnesses testified that Petitioner was the aggressor." (Dkt. 32 at 6.) Petitioner cannot show prejudice based on counsel's failure to investigate Skeen or to call her as a witness at trial.

For the foregoing reasons, the state court's decision on Claim 1 was not contrary to, or an unreasonable application of, Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

  ii.  <u>Claim 2</u>

In Claim 2, Petitioner asserts that his trial counsel rendered ineffective assistance in failing to object to testimony by Jennifer Wyatt, the paramedic who treated Maylin and testified that Maylin suffered what appeared to be a stab wound.

The paramedic first described Maylin as a "stabbing victim." (State's Lodging A-3 at 476.) She then went on to testify as to the nature of Maylin's wound:

> Q.  What did you observe?
>
> A.  I observed—it was about a one-inch in width laceration type puncture wound. It appeared to be, you know, in deep through the tissue to where you could see like the muscle and the fatty tissue underneath, so it appeared to me to

be a deep—a deep puncture. I mean, I can't tell how deep at that point.

….

Q.      [showing the witness a photograph of Maylin's wound] Is that what you saw?

A.      Yeah. I could see the top laceration portion, the wider part. That below that where the oozing was just appeared to be blood at that point. So as far as—because right here, that looks like—that looks different from when I saw it.

….

Q.      … Can you use that [laser pointer] to illustrate what you just testified to?

A.      Yes. That laceration right there was there. That's the one I'm speaking of that I recall. And this all area was just the oozing blood, so that looks like the remnants of the blood stain, and it looks like it's up there in his arm here and up on his armpit there too, but I can't say for sure that's what that is. That just—

Q.      But you believe its appearance is consistent with a blood stain?

A.      Right, like where he was bleeding ….

….

Q.      And, Ms. Wyatt, *is that wound consistent with what you've seen of stab wounds in the past?*

A.      *Yes.*

Q.      *And do you believe that to be a stab wound?*

A.      *Yes.*

(*Id*. at 483-85 (emphasis added).) Petitioner's counsel did not object to this testimony.

The Idaho Court of Appeals held that Petitioner's counsel's failure to object to the paramedic's testimony was not deficient performance and that, even if it had been, the failure to object was not prejudicial. As to the performance prong of *Strickland*, the court found that Petitioner did not come forward with evidence that trial counsel's lack of objection was not the result of a reasonable "trial strategy." *Adams II*, 387 P.3d at 163.

As to the prejudice prong, the state court held that the paramedic would have been qualified as an expert witness under Idaho Rule of Evidence 702. *Id*. at 162-63. Therefore, the paramedic's testimony that Maylin suffered a stab wound was admissible, and any objection by trial counsel would have been overruled:

> The paramedic, at the time of her testimony, had worked as a paramedic in Idaho for three years and had previously worked in emergency medical services in Utah for six years. The paramedic testified that she had graduated from a specialized school qualifying her to be a paramedic and provide emergency care for injured persons. The paramedic's testimony indicated that she had observed and treated several stab wounds in the past in her role as a paramedic. Notably, the paramedic testified about stab wounds on the deceased victim as well as the surviving victim. As part of her testimony, the paramedic detailed how stab wounds differentiated from cuts caused by other objects. The paramedic testified that she had observed various stab wounds on the deceased victim and described the appearance of the wounds as being consistent with a cut caused by a knife. When the paramedic testified concerning the surviving victim's wound, the State introduced a photograph of the surviving victim's wound and the paramedic confirmed that the photo is what she saw on the surviving victim. The paramedic detailed the nature of the wound she observed and testified that she believed it to be a stab wound because it was consistent with other stab wounds she had observed in the past.

*Id*. (footnote omitted).

Whether the paramedic's testimony was admissible under Rule 702 of the Idaho Rules of Evidence is a question of state law. Therefore, this Court is bound by the Idaho Court of Appeals' determination that the evidence was admissible. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Because an objection to the paramedic's testimony would have been overruled under Rule 702, Petitioner cannot show a reasonable probability of prejudice from the lack of such an objection.

Also, there is no evidence to rebut the presumption that not objecting to the paramedic's testimony based on her qualifications "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Petitioner's counsel reasonably could have concluded that an overruling of an objection on Rule 702 grounds would have bolstered the testimony of the paramedic in the eyes of the jury, as the paramedic would explicitly be qualified as an "expert." Because the decision not to risk that outcome was not objectively unreasonable, Petitioner has not shown deficient performance on the part of trial counsel.

For these reasons, the Idaho Court of Appeals reasonably rejected Claim 2, and Petitioner is not entitled to relief on that claim under § 2254(d).

### iii.     <u>Claim 3</u>

Claim 3 asserts that trial counsel should have requested independent DNA testing of Gorley's clothing.

Before trial, the state tested Petitioner's knife for DNA. That testing showed that Gorley's DNA was on the knife. DNA from another individual was also on the knife, but

it could not be identified as Maylin's (or any other particular individual's) DNA. (State's Lodging A-3 at 643–53.) Gorley's clothing was not tested.

During post-conviction proceedings, the state district court ordered DNA testing of that clothing. The testing involved four swabs and revealed that only Gorley's DNA was present on the portions of the clothing that were tested. Maylin's DNA was not found on those swabs. *Adams II*, 387 P.3d at 163.

Petitioner also submitted an affidavit of Dr. Greg Hampikian regarding the DNA. Dr. Hampikian opined that if a weapon punctured a person, caused "extensive bleeding," and was not "cleaned in any way," he would expect to find DNA on the weapon. (State's Lodging E-5 at 1906.) The affidavit continued:

> Hypothetically, if someone were to stab one person (person A) with an instrument and then stab a second person with that same instrument (person B), I would expect to find a mixture of person A and person B's DNA on the instrument. If person B was stabbed through his or her clothing, I would also expect to find person's A's DNA transferred to person B's clothing.

(*Id.* at 1907.) Specifically, Dr. Hampikian asserted that if Maylin's DNA was not present on Gorley's clothing, "it would support the defense."[4] (*Id.*) Another doctor, Kent Kreuder, stated that he could not conclude that Petitioner's knife caused Maylin's stab wound. (State's Lodging E-8 at 17-18.)

---

[4] By mistake, the notarized signature of Dr. Hampikian on his affidavit was not filed. The state district court—on a limited remand during post-conviction proceedings—stated that it considered the entirety of the affidavit "as if it had been notarized" and that the court "would have reached the same conclusions had Dr. Hampikian's affidavit had [sic] been received and filed in proper form." (State's Lodging F-3 at 2.)

**MEMORANDUM DECISION AND ORDER - 20**

The State's theory at trial, supported by the testimony of Maylin and Campbell, was that Petitioner stabbed Maylin before he stabbed Gorley. Petitioner contends that the "absence of [Maylin's] DNA [on Gorley's clothing] indicates that Mr. Maylin had not been stabbed when he first left the car and that he may not have been stabbed by a knife at all." (Dkt. 21 at 24.) Had trial counsel tested the clothing, argues Petitioner, counsel could have used the DNA results to impeach the paramedic's testimony that Maylin's "puncture wound" appeared to be a stab wound. (Dkt. 21 at 24.)

### a) *Petitioner's* Martinez *Argument*

In considering Claim 3, the Court must first address Petitioner's argument that the Court should hold an evidentiary hearing to determine whether post-conviction counsel rendered ineffective assistance in failing to adequately develop the DNA evidence. (Dkt. 21 at 21-22.) Petitioner appears to assert that—under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (en banc)—Claim 3 was procedurally defaulted as a result of post-conviction counsel's ineffectiveness; therefore, contends Petitioner, the purported default of Claim 3 is excused, and the Court must hold an evidentiary hearing and review the claim de novo.

As the Court previously explained with respect to Claim 1, the Court can consider whether *Martinez* applies to Claim 3 only if that claim is "fundamentally alter[ed] [from] the legal claim already considered by the state courts" or "in a significantly different and stronger evidentiary posture than it was when the state courts considered [the claim]." *Dickens*, 740 F.3d at 1318 (internal quotation marks omitted). If that is the case, then

Claim 3 is a new claim that "was neither fairly presented to the state court in the first instance nor was it adjudicated on the merits." (Dkt. 32 at 3.)

Petitioner does not contend that Claim 3 is fundamentally altered, or that it is in a significantly different and stronger evidentiary posture, from the claim he raised in state court. (*See* Dkt. 21.) And the Court concludes, based on its review of the record, that it is not. Therefore, because the state court adjudicated Claim 3 on the merits, § 2254(d) applies. Petitioner's request for a *Martinez* hearing is denied.

b)    *Merits Review of Claim 3*

The Idaho Court of Appeals rejected Claim 3 on both *Strickland* prongs, concluding that Petitioner had not shown deficient performance or prejudice arising from trial counsel's failure to seek DNA testing of Gorley's clothing before trial.

The court first noted the limited nature of the DNA results from Gorley's clothing:

> The deceased victim suffered five stab wounds, but only four swabs were submitted for analysis—two from the deceased victim's shirt and two from his jacket. The DNA report indicates that only the deceased victim's DNA was detected. The record is not clear as to whether the swabs tested two wounds at two different levels of clothing or four separate wounds. Furthermore, the absence of the surviving victim's DNA on any of the four swabbed areas of the deceased victim's clothing does not constitute exculpatory evidence proving the surviving victim was not stabbed first or that he was not stabbed by the knife at all. The report did not include analysis of all of the deceased victim's woundsites or contemplate other possible explanations as to why there may not be DNA from the surviving victim on the deceased victim's clothing. Given the limited DNA results, Adams's contention that the report shows the surviving victim was not stabbed when he first left the car and that he may not have been stabbed by a knife at all is conclusory and not supported by the report.

*Adams II*, 387 P.3d at 164.

Alternatively, the state court also took the DNA evidence in the light most favorable to Petitioner and "presum[ed] that it bolstered his testimony." *Adams II*, 387 P.3d at 164. The state court held that, nonetheless, Petitioner had not established prejudice with respect to trial counsel's failure to obtain DNA testing of Gorley's clothing because there was enough other evidence "for the jury to conclude that Adams stabbed the surviving victim," Maylin, with the knife:

> At trial, the surviving victim testified that Adams struck him under the arm while he was exiting the vehicle. Physical evidence was admitted showing the surviving victim's wound, which could be compared to the deceased victim's stab wounds. A paramedic testified that the wound was consistent with what she had seen of stab wounds in her prior experience. Adams admitted that he used his knife in the altercation. Moreover, there was no other testimony or evidence suggesting that any other person held a knife during the incident or that the surviving victim's puncture wound was caused by a different object. Based on the other evidence admitted at trial for the jury's consideration and the limited nature of the DNA results, we hold that Adams has failed to show the district court erred in concluding that the report suggesting the absence of DNA transfer would not have changed the outcome of the trial.

*Id.* at 164–65. Thus, the state court held, Petitioner had "failed to show that trial counsel's performance was both deficient and prejudicial." *Id.* at 165.

The decision of the Idaho Court of Appeals was not unreasonable under AEDPA. The evidence showed that Maylin had a "puncture wound," that Petitioner was armed with a knife, that Petitioner struggled with Maylin, and that no other sharp instrument was used in the altercation. Indeed, the only other "weapons" involved at all were blunt

objects—the rocks thrown at Petitioner—which could not have caused Maylin's puncture wound.

The only reasonable conclusion from this evidence was that Petitioner used his knife to stab Maylin; the fact that Maylin's DNA was not found on the tested portions of Gorley's clothing is only marginally relevant. And there *was* DNA from someone else on the knife. There simply was not enough DNA to identify it as Maylin's or as anyone else's. Moreover, the forensic scientist testified at trial that if Gorley was stabbed after Maylin was stabbed, it would be "possible" to find Maylin's DNA on the knife but that it depended on several factors, including the amount of bleeding caused by the wound. This would be true of the potential for Maylin's DNA on Gorley's clothing as well. Therefore, even if trial counsel had tested Gorley's clothing before trial, Petitioner has not shown a reasonable probability of prejudice, and he is not entitled to relief on Claim 3 under § 2254(d).

      iv.    <u>Claim 4</u>

In Claim 4, Petitioner asserts that trial counsel, during closing argument, abandoned Petitioner's claim of self-defense and conceded that Petitioner committed the lesser-included offense of manslaughter.

Because defense counsel's closing argument must be considered as a whole, the Court recites, at length, all portions of that argument that are relevant to Claim 4:

> Now, … the prosecutor told us at the beginning of this trial … if you've been drinking, you ought to take responsibility for your action. I agree. If I've been drinking or they've been drinking or any one of us in this room have been

drinking, we have to take responsibility for our action, but no more and no less. No more and no less.

….

No question, this is a case, a sudden quarrel that rises to the heat of passion among a group of people that have been drinking all night, drunk, intoxicated, and end result was tragedy, deadly. That's what it is. There's no robbery. There's no attempted robbery. If there's no robbery, there's no attempted robbery, the felony murder evaporate, disappear [sic].

There's no premeditation to kill anyone that night. What evidence do they have, for heaven's sake? Nothing. There's no premeditation. There's no evil intent. The end result was tragic, deadly.

This is a fight that took place among a group of people that had been drinking heavily. There's no question about that. There was no dispute about that. We call it a sudden quarrel that rises to the level of heat of passion among a group of people.

Call them stupid. I agree. Call them irresponsible. I agree. Call them immature. I agree. Call them whatever you want to call them, but there was no intent to kill anybody that night. Let him take responsibility for what he did, but no more and no less. No more and no less.

….

This is a fight, a sudden quarrel that rises to the level of a heat of passion among a group of drunk people that night that turned deadly. Deadly.

….

…Sergio said as soon as [Petitioner] came back into the car, the first thing—one of the first thing [Petitioner] said was, gosh, I thought you were my fucking friend. You know, why would somebody say that? The implication is you should have come out there and helped me, come out there and

helped me. I was fighting three or two of those guys out there by myself.

….

So he was fighting two or three guys out there by himself, and that's what he told Sergio, and Sergio didn't hear anything about threat, about money, about robbery, about $3, about $10, then what else do we have?

….

The essence of [Sergio's] testimony was that [Petitioner] said, gosh, I thought I stabbed that guy, but I'm not sure. And he said it not once, not twice. If I remember right, it was three separate occasions. But I'm not sure. What do you believe was the intent here, the intent to kill somebody? Where is the premeditation for first degree murder?

….

What are the surrounding facts and circumstances that they've shown you that there was premeditation for him to kill [Gorley] that night? What are the surrounding facts and circumstances? He didn't dispose of the knife. He went home. You're supposed to consider that.

What did he do after this incident that can enlighten you and educate you, shed more light on his intent?

This is a fight, a sudden quarrel that rises to the heat of passion among a group of drunk people that night that turned deadly.

….

Now, if there is no robbery, there's no attempted robbery, felony murder disappear [sic]. Then what do we have left? First degree murder. There's no premeditation here. Read the instruction of premeditation. Read the instruction of

malice aforethought. We don't have that.[5] And he'll take responsibility for what he did, but no more and no less.

….

You know, I told you talking about self-defense, you know hindsight is good, 20-20 is good. It describes what happened, where he was. I wasn't there. They were not there. But one thing we know for sure is there was testimony about two people swinging at each other. I think it was [Campbell] that said that, Mike Campbell, that when he looked back, he saw him and [Gorley] taking a swing at each other.

….

Hindsight is good. 20-20 is good. I wasn't there, you were not there, and he told you how he felt. That's why we have that self-defense jury instruction. You don't have to be 100 percent sure before you defend yourself. You don't. And not only that, and this is even better, you don't have to retreat. I didn't make that all up. It's right there in the jury instruction. You can stand your ground.

He's entitled to the benefit of that law, just like each and every one of us are.

This is a fight, a sudden quarrel that rise [sic] to the level of heat of passion that took place among a group of drunken people that night, and the end result was tragedy, deadly, I concede.

That's what we have. That's what we have. This case should not be decided on emotion or sympathy. It shouldn't because that wouldn't be fair, that wouldn't be just, that wouldn't be reasonable.

….

---

5 As can be seen from this statement by defense counsel, Petitioner's claim that his attorney "did not contest the malice aforethought element" of second-degree murder is inaccurate. (Dkt. 21 at 36 n.10.)

We take the good with the bad. This is a fight, a sudden quarrel that rises to the heat of passion among a group of people heavily intoxicated that turned deadly.

….

…[Petitioner] will take responsibility for what he did, but no more, no less. No more, no less.

He's not guilty of robbery. He's not guilty of attempted robbery because he didn't take anything from anyone, and the only witness you can believe is Sergio. Sergio didn't hear any threat. There's no robbery. Felony murder evaporate, disappear [sic]. There's no premeditation, none.

….

[Petitioner's] glad for this opportunity because he's been waiting for this for a long time. He's not a murderer. He's not a killer. Irresponsible action went from that day on among all these people, and the end result was tragedy. That doesn't make him a murderer, a first degree murderer, and armed robber. No, it's not. He's not guilty.

(State's Lodging A-3 at 946–71.)

The Idaho Court of Appeals made a factual finding that defense counsel did not abandon Petitioner's self-defense claim in closing argument, nor did he concede that Petitioner was guilty of manslaughter: "Although [counsel's] description of the altercation"—a "sudden quarrel that rises to the heat of passion"—"was reflective of language in the jury instructions on manslaughter, it does not follow that the use of such language means trial counsel conceded that the State had proven all the elements of the crime." *Adams II*, 387 P.3d at 166.

This factual finding is not unreasonable under § 2254(d)(2). Defense counsel *did* invoke self-defense in closing argument—twice—and never asked the jury to return a verdict on manslaughter. As the Idaho Court of Appeals held, Petitioner's "self-defense theory was before the jury throughout all proceedings":

> During opening statements, trial counsel told the jury that, during the altercation, Adams perceived a danger, feared for his life, and extracted a knife during the fight to protect himself. During the trial, defense counsel elicited testimony from Adams that he felt that he was in danger in fighting two men and was forced to defend himself from the attack. Prior to deliberations, the jury was instructed on the theory of self-defense. Finally, during closing argument, trial counsel emphasized the sudden nature of the altercation and referenced self-defense multiple times.

*Adams II*, 387 P.3d at 166.

Because defense counsel's closing argument did not do what Petitioner contends it did, the state court did not unreasonably apply *Strickland* in concluding that trial counsel's closing argument was objectively reasonable and did not constitute deficient performance. *See* 28 U.S.C. § 2254(d)(1). Counsel made a tactical decision to acknowledge that the altercation was an unfortunate fight between drunk people and to focus on the lack of premeditation and malice aforethought, rather than to focus exclusively, or heavily, on Petitioner's claim of self-defense. Counsel likely—and reasonably—determined that, given the strength of the state's case, an acquittal on all charges was improbable.

The double deference that applies when reviewing ineffective assistance claims in habeas proceedings leaves no room for this Court, with the benefit of hindsight, to

second-guess the tactical decision of Petitioner's counsel, i.e., to focus primarily on downplaying Petitioner's conduct so that the jury might compromise on manslaughter, while not abandoning the self-defense claim entirely. *Pinholster*, 131 S. Ct. at 1403; *Strickland*, 466 U.S. at 689. Thus, Petitioner has not shown that trial counsel performed deficiently, and Claim 4 must be denied.

2.      **The Idaho Court of Appeals Reasonably Rejected Petitioner's Claim of Juror Bias (Claim 5)**

In Claim 5, Petitioner argues that the trial judge should have excused Juror No. 608 sua sponte for cause, based on that juror's statements during jury selection.

During voir dire, the prosecutor asked potential Juror No. 608 about her previous experience as a juror in a criminal case. She described that experience as follows:

> …I was disappointed. At the end, the prosecutor said if you have questions, you know, stay in the room and we'll come in and answer. And I didn't like that, as jurors, we weren't given what I thought was all of the information, you know, that the courts are very selective about what jurors can hear. It's like we want you to sit up there, we want you to rule or do whatever it is you do, but we're only going to give you this little piece, and then you have to make your decision with that. I wanted—the things that he told us afterwards about the case that he could not present, I didn't understand the reasons why they couldn't, so I didn't care for that.
>
> ....
>
> …I didn't like having to—it was like every three minutes a word would be mentioned, and it's, oh, juror, leave, come back in five minutes, three minutes. Later a word is mentioned. Oh, jury's got to leave. It was like, you know, either stop saying the word or tell us what you're not telling us.

(State's Lodging A-2 at 249–50.)

Defense counsel followed up with Juror No. 608 on this issue as follows:

> DEFENSE COUNSEL: You know, there might be an occasion, an instance or an occasion where we might have to take up some legal issues, and we might have to do that in the absence of the jury.
>
> JUROR NO. 608: Yes
>
> DEFENSE COUNSEL: That we might have to excuse the jury. Will you promise me that you will not hold that against either myself or the State if that happens in this case?
>
> JUROR NO. 608: Do I promise? No.
>
> DEFENSE COUNSEL: You cannot promise that?
>
> JUROR NO. 608: (Shakes head.)
>
> DEFENSE COUNSEL: Okay. At least will you be willing to promise me that you will not be willing to hold that against Mr. Adams, the individual I'm trying to help over here?
>
> THE COURT: Counsel, with all due respect, I'm not going to allow you to require her to promise.
>
> DEFENSE COUNSEL: Okay. Will you be willing to do your best to make sure if that happens in this case, you do not hold that against Mr. Adams, the individual I'm trying to help in this case?
>
> JUROR NO. 608: Yes, I will do my best.
>
> DEFENSE COUNSEL: You will do your best. That's all we can ask for….

(*Id*. at 313–14.) Petitioner's counsel did not challenge Juror No. 608 for cause or exercise a peremptory challenge. *Adams I*, 216 P.3d at 150.

### A.    Clearly-Established Law

The Sixth and Fourteenth Amendments guarantee a defendant the right to an impartial jury. The constitutional standard for juror impartiality is whether the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). A juror should be excused for cause if a particular belief will "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

A judge's findings on whether a juror is biased, and thus should be removed for cause, are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Smith v. Phillips*, 455 U.S. 209, 218 (1982); *see also Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("[I]n determining whether [to remove] a potential juror…, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts."). It is the trial court that "is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht*, 551 U.S. at 9.

### B.    Petitioner Is Not Entitled to Relief on Claim 5

Petitioner argues that the trial court should have excused Juror No. 608 sua sponte as biased. Because trial counsel did not object to the seating of Juror No. 608, the Idaho Court of Appeals reviewed Claim 5 for fundamental error. *Adams I*, 216 P.3d at 150. The

state court found that Juror No. 608 did not have a "clear bias against the defense" and, thus, that there was no fundamental error:

> At no time did the juror indicate that she was biased against criminal defendants or in favor of the State. Instead, the juror disclosed that she resented the removal of the jurors from the courtroom when attorneys' objections required discussion in the jury's absence, and that if this occurred at Adams' trial she would not promise not to hold it against the defense attorney or the prosecutor. She expressed resentment toward a part of the trial process, not toward either party.

*Id*. at 151 (internal quotation marks omitted).

The Ninth Circuit and other appellate courts have held that a trial court has a duty to excuse a juror for cause sua sponte—meaning without a request by either party—when a juror makes statements during jury selection that demonstrate actual bias. *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009); *see also Franklin v. Anderson*, 434 F.3d 412, 428 (6th Cir. 2006) (trial court "had a duty to dismiss a prospective juror who could not follow the law"); *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (stating that "the presiding trial judge has the authority and responsibility, either sua sponte or upon counsel's motion, to dismiss prospective jurors for cause"); *cf. United States v. Simmons,* 961 F.2d 183, 184–86 (11th Cir. 1992) (finding no abuse of discretion in district court's failure to excuse jurors sua sponte for cause). The court in *Mitchell* held that, where "no motion was made during jury selection to dismiss the juror in question for cause, [a petitioner] … must show that the evidence of partiality before the district court was so indicative of impermissible juror bias that the court was obliged to strike [the juror], even though neither counsel made the request." 568 F.3d at 1151.

But this Court has found no United States Supreme Court precedent clearly establishing that a trial judge has a duty to excuse prospective jurors for cause in the absence of a motion by one of the parties. *See, e.g., Cage v. McCaughtry*, 305 F.3d 625, 626–27 (7th Cir. 2002) ("The absence of a case in the Supreme Court … declaring such a rule [requiring sua sponte dismissal of juror who gave 'potentially equivocal assurances of impartiality'] is not surprising. There is nothing suspicious about a lawyer's refusing to strike a prospective juror for cause. The lawyer might feel that on balance the juror was more likely to vote for than against his client."). In a context different from that presented here—specifically, in the context of the potential for racial bias of jurors in a capital case—the Supreme Court has held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Turner v. Murray*, 476 U.S. 28, 36–37, 37 n.10 (1986). However, the *Turner* Court expressly stated, "Should defendant's counsel decline to request voir dire on the subject of racial prejudice, we in no way require or suggest the judge broach the topic sua sponte." *Id.* at 37 n.10.

Because "[t]he Supreme Court has never announced" a rule that a trial judge "has an obligation to dismiss a juror for cause even if no lawyer objects," *Cage*, 305 F.3d at 626, the Idaho Court of Appeals' decision was not unreasonable under § 2254(d)(1). And Petitioner has not established that the factual finding of the state court—that Juror 608 was not biased—was unreasonable under § 2254(d)(2). Thus, Petitioner is not entitled to

habeas relief on his claim that the trial judge should have excused Juror No. 608 sua

sponte. *See* 28 U.S.C. § 2254(d)(1).

**3. The Idaho Court of Appeals Reasonably Rejected Petitioner's Prosecutorial Misconduct Claim (Claim 6)**

Claim 6 asserts that the prosecutor committed misconduct in rebuttal closing

argument by "appeal[ing] to the passions and

In rebuttal closing argument, the prosecutor ended with the following statement:

> So I just want to make it real clear what it is that we are asking for….
>
> …
>
> We spoke at the beginning about how on March 11 of '06, Clayton Adams was in the driver's seat, how he's not anymore, that you are. And as you take that wheel and we slide into the back seat, mere passengers at this point, we ask one thing, that you take us home, home to justice, justice for Mike Campbell who watched his friend die, justice for Stephen Maylin who got stabbed trying to run away from someone he didn't even know, justice for Tyler Gorley whose death is the reason we are here and whose life is insulted by the story that he wants you to believe, and justice for Clayton Adams who did these things, who you know committed these crimes, and who thought so little of it, that he went and bought beer.
>
> We ask for justice. Thank you.

(State's Lodging A-3 at 974-75.)

### A. *Clearly-Established Law*

The Due Process Clause guarantees the right to a fair trial, and prosecutors have a

"duty to refrain from improper methods calculated to produce a wrongful conviction."

*Berger v. United States*, 295 U.S. 78, 88 (1935). However, such methods will warrant

habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

A court must consider the record as a whole when making such a determination, because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context. *See United States v. Young*, 470 U.S. 1, 16-17 (1985); *Darden*, 477 U.S. at 182 (applying *Young*); *see also Donnelly*, 416 U.S. at 647-48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process"). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

A prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury." *Darden*, 477 U.S. at 192 (internal quotation marks omitted). However, a prosecutor's closing argument, "billed in advance to the jury as a matter of opinion not of evidence," is "seldom carefully constructed" and may contain "[i]solated passages" that are "less than crystal clear." *Donnelly*, 416 U.S. at 646-47. Therefore, a court must not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id*. at 647.

When reviewing prosecutorial misconduct claims under the "unreasonable application" prong of § 2254(d)(1), the Court must keep in mind that the due process standard is a "very general one" that affords state courts "leeway in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (internal quotation marks and alterations omitted).

### B.       *The Idaho Court of Appeals Reasonably Rejected Claim 6*

Because trial counsel did not object to the prosecutor's argument, the state appellate court reviewed Petitioner's prosecutorial misconduct claim under the fundamental error doctrine. *Adams I*, 216 P.3d at 152. The court began by setting forth the types of cases where a prosecutor's closing argument was so "patent, repeated and egregious" that it warranted reversal—cases where the prosecutor (1) "repeatedly and improperly appealed to the emotions of the jury by arguing that the jury should be upset and irritated by trial evidence that he attributed to the defense, but that was actually elicited by the prosecution"; (2) "misstated the evidence, misstated the law by grotesquely mischaracterizing the defendant's defense, and repeatedly appealed to the jury to decide the case on factors other than evidence of guilt"; or (3) "repeatedly disparaged defense counsel by implying that the defense attorney participated in or facilitated the defendant's 'lies,' asked the jury to rely on the prosecutor's self-proclaimed trustworthiness and integrity and that of the arresting officer, and appealed to the emotion and passion of the jury by asking its members to step into the shoes of a hypothetical victim of the defendant's alleged drunk driving." *Adams I*, 216 P.3d at 152.

The court of appeals then held that, unlike in those other cases, the prosecutor's statement at Petitioner's trial did not constitute fundamental error:

> First, it is permissible for a prosecutor to ask the jury to do justice if that request is in the context of argument addressing how trial evidence demonstrates the defendant's guilt. Justice is, after all, the goal of any criminal trial. If the prosecutor's requests here for justice for the victims, or his reference to the evidence of Adams' indifference to his stabbing victims, can be viewed as straying into the realm of emotion, it does not approach the level of egregiousness necessary to constitute fundamental error. These concluding remarks in the prosecutor's rebuttal argument came immediately after his description of how the trial evidence proved Adams' guilt, and it does not amount to an inflammatory appeal for the jury to render its decision on anything other than the evidence adduced at trial.

*Id.* at 153.

This decision was not unreasonable under § 2254(d). The prosecutor's brief statement, while perhaps framed to elicit sympathy and emotion, did not "so infect[] the trial with unfairness" as to violate due process. *Darden*, 477 U.S. at 180 (internal quotation marks omitted). Therefore, Petitioner is not entitled to relief on his prosecutorial misconduct claim.

**4.     The Idaho Court of Appeals Reasonably Rejected Petitioner's Cumulative Error Claim (Claim 7)**

Claim 7 asserts that the "cumulative impact of the[] errors" in Claims 1 through 6 requires habeas relief.

The Ninth Circuit has determined that the doctrine of cumulative error has been clearly established by the United States Supreme Court. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). Under cumulative error principles, "the combined effect of multiple

trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair," even if each of the errors, taken alone, would not require reversal. *Id.*

Habeas relief is warranted for cumulative error "only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly*, 416 U.S. at 643). This occurs when a petitioner can show that the prejudice standard set forth in *Brecht*, 507 U.S. at 637, has been met. *Parle*, 505 F.3d at 927. "In simpler terms, where the combined effect of individually harmless errors renders a criminal defense far less persuasive than it might otherwise have been, the resulting conviction violates due process." *Id.* (alteration and internal quotation marks omitted).

However, cumulative error presupposes error, and the Idaho Court of Appeals found no error with respect to any of Petitioner's habeas claims. *Adams II*, 387 P.3d at 168 ("Because Adams has failed to make a necessary showing he is entitled to relief on any of his ineffective assistance of counsel claims, the doctrine of cumulative error has no applicability in this case.") (post-conviction appeal finding no ineffective assistance in Claims 1 through 4); *Adams I*, 216 P.3d at 151 (direct appeal finding no fundamental error in Claim 5 or Claim 6). Because that state court reasonably found no error with respect to any of Petitioner's current habeas claims, *see* 28 U.S.C. § 2254(d), Petitioner is not entitled to relief pursuant to the cumulative error doctrine.

## CONCLUSION

The Idaho Court of Appeals' rejection of Petitioner's habeas claims was not contrary to, or an application of, clearly established Supreme Court precedent, nor was it based on an unreasonable factual finding. Therefore, Petitioner is not entitled to habeas relief under 28 U.S.C. § 2254(d).

## ORDER

**IT IS ORDERED:**

1.  The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED, and this entire action is DISMISSED with prejudice.

2.  The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner wishes to appeal, he must file a timely notice of appeal with the Clerk of Court. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: September 30, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge